**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SAQUETA WILLIAMS,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **CIVIL ACTION NO.: 2:20-CV-03387-ER** |
| : | |
| **ROC NATION, LLC, et al.,** : | |
| : | |
| **Defendants.** : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM OF DEFENDANTS AMAZON AND IPC**

Derek Jokelson
dej@jokelson.com
JOKELSON LAW GROUP, P.C.
230 South Broad St., 10th Floor
Philadelphia, PA 19102
Telephone: 215.735.7556
Facsimile: 215.985.0476

Cameron Stracher (*pro hac vice* forthcoming)
cam@stracherlaw.com
CAMERON STRACHER, PLLC
51 Astor Place, 9th Floor
New York, NY 10003
Telephone: 646.992.3850
Facsimile: 646.992.4241

*Attorneys for Defendant Intellectual Property
Corporation*

Michael Berry
berrym@ballardspahr.com
Elizabeth Seidlin-Bernstein
seidline@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

*Attorneys for Defendant Amazon.com, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.      Williams' Placement on the "Do Not Call" List ............................................... 2

II.     The *Free Meek* Documentary ............................................................................ 4

III.    Williams' Lawsuit ............................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I.      WILLIAMS CANNOT STATE A CLAIM FOR DEFAMATION OR
        FALSE LIGHT INVASION OF PRIVACY ...................................................... 7

        A.      The Law Governing Defamation and False Light Claims ...................... 7

        B.      *Free Meek* Does Not Report Any Materially False Facts About
                Williams ................................................................................................. 10

        C.      Williams Cannot Plausibly Allege that Her Image Was Displayed
                with Actual Malice .................................................................................. 17

II.     WILLIAMS CANNOT STATE A CLAIM FOR INTENTIONAL
        INFLICTION OF EMOTIONAL DISTRESS .................................................. 19

III.    WILLIAMS CANNOT STATE A CLAIM FOR CIVIL CONSPIRACY ....... 21

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Teamsters Local 115*,
   214 F. App'x 167 (3d Cir. 2007) ............................................................23

*Air Wisconsin Airlines Corp. v. Hoeper*,
   571 U.S. 237 (2014)..............................................................................8

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
   37 F.3d 996 (3d Cir. 1994)....................................................................12

*Arsenal, Inc. v. Ammons*,
   2014 U.S. Dist. LEXIS 166783 (E.D. Pa. Dec. 2, 2014) ........................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................23

*Benak v. Alliance Capital Management L.P.*,
   435 F.3d 396 (3d Cir. 2006)....................................................................3

*Beverly Enterprises, Inc. v. Trump*,
   182 F.3d 183 (3d Cir. 1999)....................................................................9

*Bogash v. Elkins*,
   176 A.2d 677 (Pa. 1962) .......................................................................9

*Brophy v. Philadelphia Newspapers Inc.*,
   422 A.2d 625 (Pa. Super. 1980)...............................................................18

*In re Burlington Coat Factory Securities Litigation*,
   114 F.3d 1410 (3d Cir. 1997)...................................................................4

*Bustos v. A&E TV Networks*,
   646 F.3d 762 (10th Cir. 2011) .................................................................16

*Chaiken v. VV Publishing Corp.*,
   119 F.3d 1018 (2d Cir. 1997)..................................................................19

*Morgan ex rel. Chambon v. Celender*,
   780 F. Supp. 307 (W.D. Pa. 1992).............................................................21

*Cheney v. Daily News L.P.*,
   654 F. App'x 578 (3d Cir. 2016) ..........................................................19, 20

*Conquest v. WMC Mortgage Corp.*,
   247 F. Supp. 3d 618 (E.D. Pa. 2017) .......................................................22

*Coughlin v. Westinghouse Broadcasting & Cable, Inc.*,
   603 F. Supp. 377 (E.D. Pa. 1985) ...........................................................17

*Coughlin v. Westinghouse Broadcasting & Cable, Inc.*,
   780 F.2d 340 (3d Cir. 1985)......................................................................17

*Cox v. Keystone Carbon Co.*,
   861 F.2d 390 (3d Cir. 1988)......................................................................20

*Curran v. Children's Service Center of Wyoming County, Inc.*,
   578 A.2d 8 (Pa. Super. 1990)..............................................................8, 10

*Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*,
   2015 U.S. Dist. LEXIS 31065 (M.D. Pa. Mar. 13, 2015).......................18

*Emekekwue v. Offor*,
   26 F. Supp. 3d 348 (M.D. Pa. 2014) .......................................................15

*Farrell v. Triangle Publications, Inc.*,
   159 A.2d 734 (Pa. 1960) .............................................................................9

*Fornshill v. Ruddy*,
   891 F. Supp. 1062 (D. Md. 1995) ............................................................13

*Goldstein v. Phillip Morris, Inc.*,
   854 A.2d 585 (Pa. Super. 2004)...............................................................21

*Green v. Mizner*,
   692 A.2d 169 (Pa. Super. 1997)..................................................................9

*Hammerstone v. Solebury Township*,
   1994 U.S. Dist. LEXIS 15755 (E.D. Pa. Nov. 7, 1994).........................18

*Hanenberg v. Borough of Bath*,
   1994 U.S. Dist. LEXIS 10161 (E.D. Pa. July 27, 1994).........................20

*Harris v. Easton Publishing Co.*,
   483 A.2d 1377 (Pa. Super. 1984).................................................8, 12, 15

*Harvest House Publishers v. Local Church*,
   190 S.W.3d 204 (Tex. Ct. App. 2006) .....................................................13

*Hill v. Cosby*,
   665 F. App'x 169 (3d Cir. 2016) ........................................................8, 17

*Hoy v. Angelone*,
    720 A.2d 745 (Pa. 1998) ................................................................................................. 19, 20

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ................................................................................................................ 19

*Jenkins v. KYW*,
    829 F.2d 403 (3d Cir. 1987) ............................................................................................. 9, 18

*Kendall v. Daily News Publishing Co.*,
    716 F.3d 82 (3d Cir. 2013) .................................................................................................. 18

*Kernick v. Dardanell Press*,
    236 A.2d 191 (Pa. 1967) ...................................................................................................... 16

*Kessler v. Monsour*,
    865 F. Supp. 234 (M.D. Pa. 1994) ..................................................................................... 20

*Marcone v. Penthouse International Magazine for Men*,
    754 F.2d 1072 (3d Cir. 1985) ........................................................................................... 9, 12

*Marier v. Lance, Inc.*,
    2009 U.S. App. LEXIS 2713 (3d Cir. Feb. 9, 2009) ........................................................ 16

*Marin v. Erie Times*,
    525 F. App'x 74 (3d Cir. 2013) ............................................................................................. 9

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) .......................................................................................................... 8, 16

*McCafferty v. Newsweek Media Group*,
    955 F.3d 352 (3d Cir. 2020) ..................................................................................... 13, 16, 17

*McKinley v. Baden*,
    777 F.2d 1017 (5th Cir. 1985) ............................................................................................. 18

*McKnight v. Baker*,
    415 F. Supp. 2d 559 (E.D. Pa. 2006) ................................................................................. 21

*Merriweather v. Philadelphia Newspapers, Inc.*,
    61 Pa. D. & C. 4th 423 (Phila. Cty. C.C.P. 2002) ............................................................. 15

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ............................................................................................. 18

*Morilus v. Countrywide Home Loans, Inc.*,
    651 F. Supp. 2d 292 (E.D. Pa. 2008) ................................................................................. 22

*New York Times Co. v. Sullivan*,
　376 U.S. 254 (1964)................................................................8, 17

*Parano v. O'Connor*,
　641 A.2d 607 (Pa. Super. 1994).............................................12

*Parkland Services v. Maple Leaf Foods, Inc.*,
　2013 U.S. Dist. LEXIS 55240 (E.D. Pa. Apr. 18, 2013) .......................22

*Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*,
　998 F.2d 1192 (3d Cir. 1993)................................................3, 4

*Philadelphia Newspapers, Inc. v. Hepps*,
　475 U.S. 767 (1986)................................................................8, 10

*Pinkney v. Meadville, Pa.*,
　2020 U.S. Dist. LEXIS 73669 (W.D. Pa. Apr. 27, 2020)...................20

*Rattray v. City of National City*,
　51 F.3d 793 (9th Cir. 1994) .....................................................18

*Redco Corp. v. CBS, Inc.*,
　758 F.2d 970 (3d Cir. 1985).....................................................9

*Salerno v. Philadelphia Newspapers, Inc.*,
　546 A.2d 1168 (Pa. Super. 1988).............................................19, 21

*Sarkees v. Warner-West Corp.*,
　37 A.2d 544 (Pa. 1944) ...........................................................9, 10, 11

*Sarpolis v. Tereshko*,
　625 F. App'x 594 (3d Cir. 2016) .............................................22

*Schonek v. W.J.A.C., Inc.*,
　258 A.2d 504 (Pa. 1969) .........................................................8, 10

*Shay v. Walters*,
　702 F.3d 76 (1st Cir. 2012).....................................................19

*Snyder v. Specialty Glass Products*,
　658 A.2d 366 (Pa. Super. 1995)...............................................20

*Strickland v. University of Scranton*,
　700 A.2d 979 (Pa. Super. 1997)...............................................23

*Sunrise Pharmacy, Inc. v. Vision Pharma, LLC*,
　799 F. App'x 141 (3d Cir. 2020) .............................................10

v

*Swartzbauer v. Lead Industries Association*,
  794 F. Supp. 142 (E.D. Pa. 1992) ............................................................23

*Tannerite Sports, LLC v. NBCUniversal News Group*,
  864 F.3d 236 (2d Cir. 2017)....................................................................11

*Teeple v. Carabba*,
  2009 U.S. Dist. LEXIS 119937 (E.D. Pa. Dec. 22, 2009) ................................21, 23

*Thomas Merton Center v. Rockwell International Corp.*,
  442 A.2d 213 (Pa. 1981) ................................................................9, 11, 14

*ToDay's Housing v. Times Shamrock Communications, Inc.*,
  21 A.3d 1209 (Pa. Super. 2011)......................................................8, 15

*Weinstein v. Bullick*,
  827 F. Supp. 1193 (E.D. Pa. 1993) ..........................................................20

## PRELIMINARY STATEMENT

This case arises from a five-part documentary series called *Free Meek*, which explores Philadelphia rapper Meek Mill's rise to fame, the criminal case against him, and the public controversy surrounding his decade-long experience with the criminal justice system.  One of the episodes explains how Mill's legal team learned that the officer who testified against him at his criminal trial was on the Philadelphia District Attorney's "Do Not Call List," which is a list of dozens of police officers whom the District Attorney directed not to be called to testify in criminal prosecutions.  When it was first revealed, the existence of the "Do Not Call List" generated substantial press coverage, and Mill's team found out the officer was on the List.  That discovery helped lead to Mill's conviction being vacated and his freedom being secured.

In explaining the nature of the List and the press coverage it generated, the documentary scans the pages of a newspaper article identifying the police officers on the "Do Not Call List." During this short scene, many officers' names and photos are displayed in the newspaper article. For one second, the documentary shows the portion of the newspaper article that mentions Saqueta Williams, the plaintiff in this case.  Based on that fleeting image of a public source, Williams filed this lawsuit.

Williams is a former Philadelphia police officer who indisputably was on the "Do Not Call List."  In her Complaint, Williams admits that in 2017 she was arrested and charged with assault, possession of an instrument of crime, and reckless endangerment after she drew her firearm, identified herself as a police officer, and threatened four people during a confrontation while off duty.  She also admits that, following her arrest, she was placed on the List.  And, she admits that her placement on the List was covered by the press.  Nevertheless, Williams contends that *Free Meek*'s brief display of the article mentioning her inclusion on the "Do Not Call List"

caused her severe emotional distress.  As a result, she filed this lawsuit asserting claims for defamation, false light invasion of privacy, intentional infliction of emotional distress, and civil conspiracy.

Even accepting Williams' allegations of harm as true, she cannot state any claim. Williams' defamation and false light claims fail as a matter of law because the documentary does not convey any materially false facts about her, and the individual statements on which she bases her claims, when viewed in context, address the List as a whole and cannot reasonably be understood to be stating any facts about her individually.  In addition, Williams cannot establish that the documentary was broadcast with actual malice – specifically, she has failed to plead and cannot plausibly allege that defendants intended to convey any false fact about her.

Williams' intentional infliction of emotional distress claim fails because (1) she cannot use such a claim to avoid the legal bar to her defamation claim, and (2) including the newspaper image of her in the documentary for one second does not meet Pennsylvania's high standard for "extreme and outrageous" conduct.

Finally, Williams' civil conspiracy claim fails because (1) she cannot state a claim for any of the underlying torts, (2) her Complaint shows the alleged conspirators did not produce *Free Meek* for the sole purpose of injuring her, as required under Pennsylvania law, and (3) her Complaint fails to allege any facts that would demonstrate defendants entered an agreement to engage in unlawful conduct.  Accordingly, her Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### I.    Williams' Placement on the "Do Not Call List"

Williams served as an officer with the Philadelphia Police Department from 2010 to June 2017, when she was arrested on charges of assault, possession of an instrument of crime, and reckless endangerment.  Compl. (Dkt. No. 1) ¶¶ 19, 27.  Her arrest followed a confrontation she

had with four civilians while she was off duty.  *Id.* ¶¶ 21, 27.  During the confrontation, Williams identified herself as a police officer, gave the four strangers "verbal commands," drew her firearm, and threatened them.  *Id.* ¶¶ 22-26.  Although Williams was acquitted of the charges in February 2019, she has not served as a police officer since her 2017 arrest.  *Id.* ¶¶ 19, 28.

Following Williams' arrest, the Philadelphia District Attorney's office placed her on the "Do Not Call List" (the "List").  *Id.* ¶ 36.  The List "identif[ied] police officers who have histories of arrests, disciplinary actions, or providing false testimony."  *Id.* ¶ 30.  It was called the "Do Not Call List" because the District Attorney directed that some of the police officers on the List, including Williams, should not be called to testify as witnesses in criminal cases without the approval of a high-ranking prosecutor.  *Id.* ¶¶ 32, 42.[1]  When the existence of the List was discovered, its revelation was covered extensively by the media.  *Id.* ¶ 33.[2]

_____

[1] A true and correct copy of the "Do Not Call List" is attached hereto as Exhibit A.  The Court may consider it in ruling on this motion to dismiss because it is incorporated by reference into the Complaint.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (explaining that courts can consider documents that are referenced in complaint or integral to plaintiff's claims when ruling on motion to dismiss).  The Complaint misleadingly suggests that, because Williams could be called to testify "with the approval of a Deputy Philadelphia Assistant District Attorney," Compl. ¶ 42, she was in a less restrictive category than some other officers on the List who could not be called to testify at all, *id.* ¶ 32.  In fact, some other officers on the List could be called to testify without restriction or after informing the defense of the alleged misconduct, *see generally* Ex. A, but Williams was in the *most restrictive* category of officers who could not be called to testify without special permission.  *See id.* at 11.

[2] *See, e.g.*, Mark Fazlollah, Craig R. McCoy, and Julie Shaw, *Under court order, District Attorney Krasner releases list of tainted police*, Phila. Inquirer (Mar. 6, 2018), https://www.inquirer.com/philly/news/larry-krasner-philadelphia-police-tainted-misconduct-secret-list-20180306.html#loaded; Julie Shaw and Chris Palmer, *Here are the 29 Philly cops on the DA's 'Do Not Call' list*, Phila. Inquirer (Mar. 6, 2018), https://www.inquirer.com/philly/news/crime/29-philly-officers-do-not-call-list-krasner-20180306.html; *The full list of Philadelphia's 66 problem cops*, Phila. Inquirer, https://www.inquirer.com/crime/inq/full-list-philadelphias-66-problem-cops-20180316.html.  The Court may take judicial notice of news reports for the fact of their publication.  *Benak v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006).

## II.   The *Free Meek* Documentary

The *Free Meek* documentary traces the rise to fame of rapper Robert Rihmeek Williams –
professionally known as Meek Mill – and explores his long-running criminal case over charges
of gun and drug possession.  Compl. ¶ 45; Ex. B-1 to B-5.[3]  The documentary details the
circumstances surrounding Mill's original conviction, his decade-long court-ordered probation, a
Philadelphia judge's controversial decision to incarcerate him for an alleged probation violation
in 2017, and his legal team's subsequent effort to free him.  *See* Ex. B-1 to B-5.  This lawsuit
arises from a brief snippet in the fourth episode of the series.  *See* Ex. B-4.  That episode
provides a contemporaneous look at Mill's legal team's investigation into his original conviction
as they sought his freedom in late 2017 and early 2018, giving a real-time perspective on how
their investigation unfolded.  *See id.*

Titled *Filthadelphia*, the fourth episode shows how Mill's team discovered that Reginald
Graham, the only officer who testified against Mill at trial, was on the "Do Not Call List."  Ex.
B-4 at 34:15-37:45; Compl. ¶ 32.  The documentary sets the stage for that discovery by first
detailing the controversy sparked when the public learned that the Philadelphia District
Attorney's Office maintained the List.  Ex. B-4 at 35:16.  The scene describes the election of
District Attorney Larry Krasner following his predecessor's criminal conviction on corruption
charges, the subsequent revelation of the List to the public, the media's extensive coverage of the
List, and Mill's team learning that Graham was on the List.

---

[3] A true and correct copy of the documentary is attached hereto as Exhibits B-1 through
B-5.  For ease of reference, time codes have been added to each episode.  Because the
documentary is the subject of Williams' claims and is incorporated by reference into her
Complaint, the Court may consider it in ruling on this motion to dismiss.  *Pension Benefit Guar.
Corp.*, 998 F.2d at 1196; *see also, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,
1426 (3d Cir. 1997) (holding that courts can consider materials on which claim is based).

The scene begins with an on-camera interview with journalist Paul Solotaroff, who explains Philadelphia "has been riven by landmark scandal after landmark scandal," while newspaper headlines about past police scandals flash on the screen.  *Id.* at 34:20-38.  Solotaroff then comments, "There's a reason people call this town Filthadelphia."  *Id.* at 34:33-34:36.  The documentary immediately cuts to a television news report announcing that former Philadelphia District Attorney Seth Williams had pled guilty to a charge of corruption.  *Id.* at 34:37-54.

The scene then introduces the "Do Not Call List" through Solotaroff, who speaks while news clips of Krasner's swearing-in ceremony are shown on screen.  He states:  "Now there is a new District Attorney in town, and in just the last couple of months, we have been learning from the District Attorney's Office about a list of dirty and dishonest cops."  *Id.* at 34:59-35:02, 35:15-35:25.

Following Solotaroff's introduction of the List, the documentary shows a clip of a 6ABC television news report in which an anchor states that a court ordered the release of the "Do Not Call List."  The news anchor explains, just as Williams explains in her Complaint, that the List is "a list of officers so troubled prosecutors will not call them to testify about their cases.  Assault, drug dealing, mishandling evidence, lying to authorities – and that's just a partial list of what's on there."  *Id.* at 35:28-44; *see also* Compl. ¶ 30 (alleging that List "identif[ies] police officers who have histories of arrests, disciplinary actions, or providing false testimony").

The documentary next cuts to an on-camera interview with public defender Bradley Bridge, who states, "The DA's Office generated a specific list that has 66 names of police officers on it.  There have been findings by the police department that the officers have lied to internal affairs, to other police officers, or in court, and as a result, we're going to have to look through every single case, every single conviction involving officers that were on the list and file

petitions to reopen those cases, and there will probably be many thousands of cases that will be brought based upon this acknowledgment by the District Attorney's Office that there are serious questions about the credibility of these officers."  Ex. B-4 at 35:47-36:22.

During the documentary's discussion of the List and its public release, the screen displays a series of snippets of two March 2018 *Philadelphia Inquirer* articles reporting the disclosure of the List and the names and photographs of officers included on it.  *See id.* at 35:37-47, 35:52-36:03, 36:38-43.  Over the course of 25 seconds, the documentary scans over pages of the *Inquirer* articles, showing the name, photograph, and/or alleged misconduct of fifteen different officers.  *See id.*  During that montage, an image of the section of an article mentioning Williams' inclusion on the List appears for approximately one second.  *See id.* at 35:59-36:00. The snippet of the *Inquirer* article that depicts Williams reports that she was "[c]harged with terroristic threats and simple assault."  *Id.*

Immediately after Bridge's comments, the documentary cuts to a scene showing Mill's uncle reading a newspaper, recalling how he had seen the news of a "secret list," and then expressing his surprise when learning that "the cop that testified against Meek was one of the guys on the List."  *Id.* at 36:22-36:38.  The scene continues by displaying the snippet of the *Inquirer* article showing Graham's inclusion on the List and discussing the misconduct that resulted in him being placed on the List, *i.e.*, being brought before a police disciplinary board for committing a theft and lying to federal authorities.  *Id.* at 36:38-37:22.

III.   **Williams' Lawsuit**

In this case, Williams has sued five defendants for their alleged roles in producing and distributing *Free Meek*:  Roc Nation, LLC, Mill, Shawn Corey Carter ("Jay-Z"), Amazon.com, Inc., and Intellectual Property Corporation ("IPC").  Compl. ¶¶ 6-10.  In her Complaint, Williams concedes she was included on the "Do Not Call List" as a result of her 2017 arrest, and

that her inclusion on the List was covered by the press. *Id.* ¶¶ 33, 36. She claims, however, that

the passing reference to her in *Free Meek* falsely portrays her as "a dirty, corrupt, immoral, and

dishonest police officer" who "lied to internal affairs, to other police officers, or in court." *Id.*

¶¶ 51-57. As a result, Williams alleges, she has suffered "discomfort, trauma, humiliation,

embarrassment, emotional distress, suicidal ideation, anxiety, depression," and other injuries. *Id.*

¶¶ 111-16. Her Complaint asserts claims for defamation, false light invasion of privacy,

intentional infliction of emotional distress, and civil conspiracy against all defendants.[4] *See id.*

Counts I-IV. As detailed below, none of those claims is viable as a matter of law.

## ARGUMENT

## I.   WILLIAMS CANNOT STATE A CLAIM FOR DEFAMATION OR FALSE LIGHT INVASION OF PRIVACY.

The fleeting use of Williams' image in *Free Meek* cannot give rise to a claim for

defamation or false light invasion of privacy. The documentary does not report any false facts

about Williams, and the various statements about the List that Williams points to cannot

reasonably be understood as intended to be about her individually. The documentary is,

therefore, fully protected under well-established Pennsylvania and constitutional law.

### A.   The Law Governing Defamation and False Light Claims

Under Pennsylvania law and the First Amendment, a plaintiff can pursue a claim for

defamation and false light only if she proves that the defendant published a false factual

---

[4] This is Williams' second lawsuit arising from the same set of facts. On January 7, 2020, Williams filed an action for defamation and/or negligent infliction of emotional distress against Roc Nation, Mill, Jay-Z, Amazon, and Wenner Media, LLC. *Williams v. Roc Nation, LLC*, No. 2:20-cv-00122-NIQA (E.D. Pa.). After Williams voluntarily discontinued her claims against Wenner Media based on the company's demonstration that it had no involvement with the documentary, the remaining defendants filed motions to dismiss for failure to state a claim. *Id.* at Dkt. Nos. 8, 9, 19, 21. Rather than respond to the motions, Williams voluntarily dismissed her claims without prejudice. *Id.* at Dkt. No. 23. She then filed this action on July 10, 2020.

statement about her.  *See, e.g.*, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776

(1986) (plaintiff "bear[s] the burden of showing falsity"); *Hill v. Cosby*, 665 F. App'x 169, 174

(3d Cir. 2016) ("[A] statement must be provable as false to give rise to a claim of defamation.").

A statement is not actionable merely because it is false – the falsity must be "material."

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991); *see also Curran v. Children's

Serv. Ctr. of Wyo. Cty., Inc.*, 578 A.2d 8, 13 (Pa. Super. 1990) (false light requires "major

misrepresentation").  Thus, a plaintiff cannot state a claim where the "gist" or "sting" of the

publication is substantially true, and a publication "is not considered false unless it would have a

different effect on the mind of the reader from that which the pleaded truth would have

produced."  *Masson*, 501 U.S. at 516-17 (internal quotation marks omitted).  In other words,

whether a falsehood is material depends on whether the falsehood itself "affects the subject's

reputation" relative to the actual truth.  *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 251

(2014); *see, e.g.*, *ToDay's Hous. v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209, 1215 (Pa.

Super. 2011) (misstatement of fact is not actionable "if the effect upon a reader is the same

regardless of the inaccuracy").

Of course, the challenged statement must state something false *about* the plaintiff.  *See

Schonek v. W.J.A.C., Inc.*, 258 A.2d 504, 507 (Pa. 1969) ("Defamatory words, in order to be

actionable, must refer to some ascertained or ascertainable person, and that person must be the

plaintiff." (internal quotation marks omitted)).  Accordingly, a plaintiff must establish that "the

defamatory material was capable of being reasonably understood as intended to refer to the

complainant," *Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1385 (Pa. Super. 1984), and, to be

actionable, a statement must "reasonably be read as accusing [the plaintiff] of personal

involvement in the acts in question," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288-89 (1964).

The determination of whether a publication can be reasonably understood to convey a materially false fact about the plaintiff presents a threshold question of law for the Court. *See, e.g.*, *Marin v. Erie Times*, 525 F. App'x 74, 77 (3d Cir. 2013); *Jenkins v. KYW*, 829 F.2d 403, 404, 406 (3d Cir. 1987); *Sarkees v. Warner-W. Corp.*, 37 A.2d 544, 546 (Pa. 1944).  As the Pennsylvania Supreme Court has instructed, a claim can proceed only if the publication at issue can "fairly and reasonably be construed to have the libelous meaning ascribed to it by plaintiff," *Bogash v. Elkins*, 176 A.2d 677, 678 (Pa. 1962), and the Court has a "duty" to "determine . . . whether a recipient of the communication could reasonably conclude that it referred to the plaintiff," *Farrell v. Triangle Publ'ns, Inc.*, 159 A.2d 734, 739 (Pa. 1960).

In making these assessments, the challenged statements must be viewed in their "full context," *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 216 (Pa. 1981), and a court must "consider the effect of the entire" publication, *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. 1997).  *See also Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985) ("The proper test . . . requires that the allegedly libelous communication be read as a whole, in context.").  Context, as the Pennsylvania Supreme Court has explained, is critical: "[W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable." *Thomas Merton Ctr.*, 442 A.2d at 216 (internal quotation marks omitted).  A claim cannot be based on an "unfair and forced construction . . . of the publication." *Bogash*, 176 A.2d at 679 (internal quotation marks omitted).  Thus, when the meaning alleged by the plaintiff is not reasonable, that meaning must be rejected, and the plaintiff must be held to have "failed to state a claim" as a matter of law. *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d Cir. 1999); *see also, e.g.*, *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) (rejecting defamation claims based

on alleged meaning that was "unreasonable"); *Sarkees*, 37 A.2d at 546 (explaining that court

must reject a defamation claim "[i]f the words are not susceptible of the meaning ascribed to

them by the plaintiff" and holding that plaintiff could not state claim because the publication at

issue was not susceptible to the alleged meaning); *Schonek*, 258 A.2d at 507 (rejecting

defamation claim because "[a] reasonable man could find no basis for the plaintiff's allegation

that the statements accused him of the" reported misconduct).

### B. *Free Meek* Does Not Report Any Materially False Facts About Williams

*Free Meek* does not report any false facts about Williams. The documentary accurately

shows that Williams was one of dozens of police officers placed on the Philadelphia District

Attorney's "Do Not Call List," and that their placement on the List was widely publicized in the

media. Williams does not and cannot contest these facts.

The documentary also makes clear that officers were included on the "Do Not Call List"

for a variety of reasons. The 6ABC news report that describes the List explains that it

encompassed a wide range of misconduct by police officers: "Assault, drug dealing,

mishandling evidence, lying to authorities – and that's just a partial list of what's on there."

Ex. B-4 at 35:28-44. Williams does not allege that anything about this description of the List is

inaccurate – indeed, it mirrors her own description of the List in the Complaint. *See* Compl. ¶ 30

(alleging that List "identif[ies] police officers who have histories of arrests, disciplinary actions,

or providing false testimony"). Williams concedes that she was arrested for assault, one of the

forms of misconduct included in the documentary's description of the List. *See id.* ¶ 27.

Because the documentary does not convey any false facts about Williams, she cannot meet her

threshold burden of proving falsity and therefore cannot state a claim for defamation or false

light. *See, e.g.*, *Hepps*, 475 U.S. 767, 776; *Curran*, 578 A.2d at 13; *see also Sunrise Pharm., Inc.*

*v. Vision Pharma, LLC*, 799 F. App'x 141, 142 (3d Cir. 2020) (plaintiff must "plausibly plead that [defendant] made a false statement").

Williams nonetheless seeks to manufacture claims by contending that the fleeting display of her image from the newspaper falsely implies that she was "a dirty, corrupt, immoral, and dishonest police officer" who "lied to internal affairs, to other police officers, or in court." Compl. ¶¶ 51-57. Williams bases her alleged meaning on a handful of statements from the documentary, trying to tie those statements to the fleeting one-second display of her image by taking them entirely out of context. Specifically, her Complaint points to three statements:

- Solotaroff's statement, "There is a reason people call this town Filthadelphia," Compl. ¶ 47; Ex. B-4 at 34:33-34:36;

- Solotaroff's statement, "Now there is a new District Attorney in town, and in just the last couple of months, we have been learning from the District Attorney's Office about a list of dirty and dishonest cops," Compl. ¶ 48; Ex. B-4 at 34:59-35:02, 35:15-35:25; and

- Bridge's statement, "The DA's Office generated a specific list that has 66 names of police officers on it. There have been findings by the police department that the officers have lied to internal affairs, to other police officers, or in court," Compl. ¶ 49; Ex. B-4 at 35:47-36:02.

Williams' gambit is contrary to well-established law, which requires these statements to be given their "natural meaning," *Sarkees*, 37 A.2d at 546, when viewed in their "full context," *Thomas Merton Ctr.*, 442 A.2d at 216; *see also supra* at 9-10. When her image and these three statements are considered in context, the meaning alleged by Williams is unreasonable as a matter of law. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247-50

(2d Cir. 2017) (affirming dismissal of defamation claim on falsity grounds because, among other things, "no reasonable viewer could have understood either publication, taken as a whole, to mean" what was alleged by plaintiff).

*First*, no reasonable viewer would understand the epithet "Filthadelphia" – a play on the words "filthy" and "Philadelphia" – to be directed at Williams.  Solotaroff uses the word in the midst of recounting that Philadelphia "has been riven by landmark scandal after landmark scandal," as a series of headlines about different incidents of past police corruption flash on the screen.  Ex. B-4 at 34:19-34:33.  Immediately after Solotaroff says, "[t]here is a reason they call this town Filthadelphia," the documentary cuts to a montage of news reports about the conviction of the former District Attorney on corruption charges.  *Id.* at 34:37-34:57.  The fleeting image of Williams does not appear until more than a minute later.  *Id.* at 35:59-36:00.  Thus, viewed within the episode "as a whole, in context," *Marcone*, 754 F.2d at 1078, the word "Filthadelphia" cannot be "reasonably understood as intended to refer to" Williams, *Harris*, 483 A.2d at 1385.

Additionally, the word "Filthadelphia" itself belies the notion that it is about Williams – it is obviously aimed at the entire city of Philadelphia, not at her in particular.  *See Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994) ("[N]o claim arises from a defamatory remark directed toward a group whose membership is so numerous that no individual member can reasonably be deemed its intended object.").  And, even if the word "Filthadelphia" were plausibly about Williams, it is a statement of subjective opinion based on her inclusion on the "Do Not Call List" and thus cannot give rise to any claim.  *See Parano v. O'Connor*, 641 A.2d 607, 609 (Pa. Super. 1994) (no claim for statement that reflects a defendant's "subjective interpretation, or opinion").  As the Third Circuit has explained, "derogatory characterizations

without more" are not actionable.  *McCafferty v. Newsweek Media Grp.*, 955 F.3d 352, 358 (3d Cir. 2020).

      ***Second***, the comments by Solotaroff and Bridge, stating that the "Do Not Call List" includes "dirty and dishonest cops" and officers who "lied to internal affairs, to other police officers, or in court," cannot reasonably be understood to detail the specific acts of misconduct that resulted in any individual police officer being placed on the List, much less the conduct of Williams specifically.  To the contrary, the documentary explains, through the 6ABC news report, that the District Attorney placed police officers on the List for various forms of misconduct, ranging from assault and drug dealing to mishandling evidence and lying to authorities.  In context, no reasonable viewer would understand Solotaroff's and Bridge's statements to mean that every officer shown in the scene was on the List for committing each of the types of misconduct discussed in the scene, let alone that they all lied to authorities or were "dishonest," or that Williams in particular was placed on the List for those reasons.[5]  In fact, the documentary discusses the specific misconduct of only one officer:  Reginald Graham, the officer who arrested Mill and who, as the documentary details at length, was put on the List after a police disciplinary board found that he had committed a theft and lied to federal authorities. Ex. B-4 at 36:38-37:28.

---

      [5] *See also, e.g.*, *Fornshill v. Ruddy*, 891 F. Supp. 1062, 1066, 1071 (D. Md. 1995) (report accusing "Park Police" of cover-up in investigation of Vince Foster's death not properly interpreted as accusation against plaintiff, even though he was one of only three officers named in report); *Harvest House Publishers v. Local Church*, 190 S.W.3d 204, 213-14 (Tex. Ct. App. 2006) (dismissing defamation claim against *Encyclopedia of Cults*, which identified plaintiff church as cult, enumerated several "characteristics of cults" including prostitution, rape, and child molestation, and stated that not "all groups" practiced them, because no "reasonable reader could believe that all groups named in the book participate in [those] criminal activities").

The fact that Williams' image from the newspaper appears briefly during Bridge's commentary makes no difference.  Notably, the Complaint distorts the meaning of Bridge's statement by quoting only a portion of it, alleging that Bridge said, "There have been findings by the police department that the officers have lied to internal affairs, to other police officers, or in court."  Compl. ¶ 49.  But, in the very same sentence, Bridge goes on to explain, "and as a result, we're going to have to look through every single case, every single conviction, involving officers that were on the list and file petitions to reopen those cases."  Ex. B-4 at 35:47-36:22.

In context, Bridge's commentary does not purport to catalogue all of the misconduct that caused officers to be placed on the List or suggest that any particular officer engaged in any specific act of misconduct.  Rather, when viewed in connection with the 6ABC news report's accurate summary of the different types of misconduct that led the District Attorney to place police officers on the List, and accompanied by an array of officers' images from the newspaper flashing on screen, Bridge's commentary explains the broader significance of the List to criminal defendants who, like Mill, might challenge their convictions following the revelation of the List.

The meaning of Bridge's commentary is reinforced by its use as a transition to the documentary's next scene, where Mill's uncle recalls learning from the news that the officer who arrested Mill was on the List and, as the documentary explains, that the officer lied to federal authorities.  In this broader context, Bridge's general statement about officers on the List having lied to authorities plainly does not refer to the misconduct of any particular officer on the List. *See, e.g.*, *Thomas Merton Ctr.*, 442 A.2d at 216-17 (defamation claim not actionable because it was "unreasonable to infer from the entire article that appellee was actively and knowingly aiding the Soviet Union," even if statements taken out of context might have conveyed that implication "standing alone").

14

Moreover, the notion that Williams, or every single one of the officers whose images were displayed, was placed on the List for lying to authorities is dispelled by the portions of the *Inquirer* article that appear on the screen throughout the scene. Those images show, just as the 6ABC report made clear, that officers were placed on the List for different reasons, including assault, DUI, and contempt of a protection from abuse order. *See, e.g.*, Ex. B-4 at 35:41, 35:53. And, the portion of the *Inquirer* article about Williams shows that she was placed on the List following her arrest for assault. *See id.* at 35:59-36:00.

These images and the related text state why each individual was on the List and underscore that Solotaroff's and Bridge's statements are not "capable of being reasonably understood as intended to refer to" the reason Williams was on the List. *Harris*, 483 A.2d at 1385; *see, e.g.*, *Emekekwue v. Offor*, 26 F. Supp. 3d 348, 361 (M.D. Pa. 2014) (defamation claim not actionable where allegedly defamatory implication was "contradicted" by other statements in challenged communication); *ToDay's Hous.*, 21 A.3d at 1216 (defamation claim not actionable where newspaper article "explicitly refuted" plaintiff's contention that defendant falsely implied plaintiff "was the manufacturer" of defective modular homes); *Merriweather v. Phila. Newspapers, Inc.*, 61 Pa. D. & C. 4th 423, 437 (Phila. Cty. C.C.P. 2002) (defamation claim not actionable where "the remainder of the article includes a passage which expressly refutes the defamatory implication that plaintiff attempts to ascribe to the limited portion of the article about which he is complaining"), *aff'd*, 835 A.2d 842 (Pa. Super. 2003).

**Third**, even if Williams' alleged meaning were reasonable and the documentary could be understood to convey that she was placed on the "Do Not Call List" for lying to authorities, that alleged falsity would be immaterial. The undisputed fact is that the District Attorney's Office placed Williams on the List: It determined that she was a tainted police officer who could not be

called to testify in any prosecution against an alleged criminal without the permission of a high-ranking official.  Compl. ¶¶ 36, 42; Ex. A.  Indeed, Williams concedes that she was placed on that List after being arrested for her involvement in a confrontation while she was off duty, in which she identified herself as a police officer, drew her firearm, and threatened civilians.  Compl. ¶¶ 23-27, 36.  Here, the "'sting[] of the libelous charge'" is that the District Attorney's office placed Williams on the "Do Not Call List"; reporting the "pleaded truth" about the reason she was put on the List would not "have a different effect on the mind of the reader."  *Masson*, 501 U.S. at 516-17; *see, e.g.*, *Marier v. Lance, Inc.*, 2009 U.S. App. LEXIS 2713, at *5 (3d Cir. Feb. 9, 2009) (affirming dismissal of defamation claim on material falsity grounds because "the 'sting' of the statement that [plaintiffs] were escorted off the property by the police is not literally whether or not they were actually escorted off of the property by the police," but instead was suggestion "that the police had to get involved in [the] dispute," which was true); *Bustos v. A&E TV Networks*, 646 F.3d 762, 764 (10th Cir. 2011) ("we assess the materiality of a misstatement by comparing the damage it has done to the plaintiff's public reputation to the damage the truth would have caused"); *see also Kernick v. Dardanell Press*, 236 A.2d 191, 193 (Pa. 1967) ("The law stands as a guardian to protect a man's good name earned in the heat of battle, in the sweat of work, and in the laboratory of conscience, but it cannot prescribe hospitalizations for abrasions or order surgery for a hiccough.").

*Lastly*, Solotaroff's characterization of the List as including "dirty and dishonest cops" is protected opinion.  Because the documentary fully discloses the variety of offenses that led the District Attorney's office to place different officers on the List, viewers "can easily judge the facts for themselves," *McCafferty*, 955 F.3d at 357, and draw their own conclusions about whether Solotaroff's characterization of the List as including cops who were "dirty and

dishonest" is justified.  *See, e.g.*, *Hill*, 665 F. App'x at 175-76 (alleged implication that plaintiff was "a liar" not actionable where facts supporting opinion were "adequately disclosed").

The bottom line is that none of these statements is actionable when viewed as part of the documentary as a whole.  As a result, Williams' defamation and false light should be dismissed with prejudice.

### C. Williams Cannot Plausibly Allege that Her Image Was Displayed with Actual Malice.

For both her defamation and false light claims, Williams must establish that her image from the newspaper was included in the documentary with actual malice.  With respect to her false light claim, actual malice is an element of the tort.  *See, e.g.*, *McCafferty*, 955 F.3d at 360. And, with respect to her defamation claim, the First Amendment requires Williams to meet that demanding standard because her image appears in *Free Meek* in connection with her position as a police officer.  *See, e.g.*, *Sullivan*, 376 U.S. at 279-80.  As defendants Roc Nation, Mill, and Jay-Z set forth in the Memorandum of Law supporting their motion to dismiss, police officers are considered public officials who must plead and prove actual malice.  Indeed, in *Coughlin v. Westinghouse Broadcasting & Cable, Inc.*, 603 F. Supp. 377, 386 (E.D. Pa. 1985), the court held that the plaintiff – a Philadelphia police officer just like Williams – was a public official.  As the court explained:

> The cop on the beat is the member of the department who is most visible to the public.  He possesses both the authority and the ability to exercise force. . . .  The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official.

*Id.* (internal quotation marks and citation omitted).  The Third Circuit subsequently affirmed that ruling.  *See Coughlin v. Westinghouse Broadcasting & Cable, Inc.*, 780 F.2d 340, 342 (3d Cir.

1985) ("We hold that the district court correctly determined that [plaintiff Philadelphia police officer] was a public official.").[6]

Under this binding precedent, Williams must establish that defendants published the challenged segments of the documentary knowing they were false, "entertain[ing] serious doubts as to the[ir] truth," or with a "high degree of awareness" of their "probable falsity." *Jenkins*, 829 F.2d at 407.  And, because she alleges that *Free Meek* conveyed a false implication about her, Williams must show that "the defendant[s] either intended to communicate" the alleged implication or "knew that the defamatory [implication] was not just possible, but likely, and still made the statement despite . . . knowledge of that likelihood." *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 91 (3d Cir. 2013).

As detailed in the Memorandum filed by defendants Roc Nation, Mill, and Jay-Z, Williams' Complaint offers nothing more than conclusory allegations and rote recitations of the law governing actual malice.  Those allegations are insufficient to meet her pleading burden. *See, e.g.*, *Earley v. Gatehouse Media Pa. Holdings, Inc.*, 2015 U.S. Dist. LEXIS 31065, at \*6 (M.D. Pa. Mar. 13, 2015).  And, any claim of actual malice is implausible because the documentary includes the newspaper article reporting on the actual reason Williams was placed on the List, which directly contradicts the implication she alleges.  *See, e.g.*, *Michel v. NYP Holdings, Inc.,* 816 F.3d 686, 703 (11th Cir. 2016).

---

[6] Numerous courts around the country have held that police officers are public officials. *See, e.g.*, *Rattray v. City of National City*, 51 F.3d 793, 800 (9th Cir. 1994) (holding that police officer was public official); *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985) ("[f]ederal courts have consistently held police officials to be public officials for the purposes of" applying actual malice standard); *Hammerstone v. Solebury Twp.*, 1994 U.S. Dist. LEXIS 15755, at \*23 (E.D. Pa. Nov. 7, 1994) ("Courts have consistently treated police officers as public officials subject to the actual malice standard."); *Brophy v. Phila. Newspapers Inc.*, 422 A.2d 625, 628-29 (Pa. Super. 1980) (holding that Philadelphia police officers were public officials).

For this separate and independent reason, Williams' defamation and false light claims should be dismissed with prejudice.

## II.    WILLIAMS CANNOT STATE A CLAIM FOR INTENTIONAL <u>INFLICTION OF EMOTIONAL DISTRESS.</u>

Williams cannot state a claim for intentional infliction of emotional distress for two reasons.  ***First***, Williams' emotional distress claim is based on the same theory and facts as her defamation claim.  The law prohibits Williams from recasting a failed defamation claim as a claim for emotional distress.  *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55-56 (1988) (plaintiff cannot maintain emotional distress claim arising from speech without satisfying limitations applicable to defamation claim); *Shay v. Walters*, 702 F.3d 76, 83 (1st Cir. 2012) ("The Supreme Court has made it pellucid that a failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress."); *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997) (plaintiffs "cannot avoid the obstacles involved in a defamation claim by simply relabeling it as a claim for intentional infliction of emotional distress").  Thus, if this Court dismisses Williams' defamation claim, her emotional distress claim must be dismissed with prejudice as well.

***Second***, a claim for intentional infliction of emotional distress can be pursued only when the defendant's alleged conduct is "extreme and outrageous."  *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998).  To state a viable claim, the alleged conduct must be "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to civilized society."  *Salerno v. Phila. Newspapers, Inc.*, 546 A.2d 1168, 1172 (Pa. Super. 1988); *see also Cheney v. Daily News L.P.*, 654 F. App'x 578, 583-84 (3d Cir. 2016) (affirming dismissal of intentional infliction of emotional distress claim because conduct of publishing allegedly false news report was not extreme and outrageous).

19

It is for the Court to determine in the first instance whether the alleged conduct could reasonably be regarded as extreme and outrageous. *Cheney*, 654 F. App'x at 583-84. The Pennsylvania Supreme Court has instructed that this tort is reserved "for only the most clearly desperate and ultra extreme conduct." *Hoy*, 720 A.2d at 754. Indeed, "Pennsylvania courts have been unwilling to find that conduct rises to this level and have been cautious in permitting recovery for this tort." *Kessler v. Monsour*, 865 F. Supp. 234, 241-42 (M.D. Pa. 1994). Thus, "Pennsylvania courts have found a cause of action for [intentional infliction of emotional distress] to exist only in limited circumstances, where the conduct has been clearly outrageous." *Snyder v. Specialty Glass Prods.*, 658 A.2d 366, 375 (Pa. Super. 1995); *see also Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) ("Pennsylvania courts have been chary to declare conduct 'outrageous'").

Here, Williams has alleged that the production and distribution of *Free Meek* constitutes "outrageous conduct" because it included "defamatory communication(s) relating" to her. Compl. ¶ 130. Courts in Pennsylvania, however, routinely hold that publishing a news report on a matter of public concern, even if erroneous, defamatory, or against the subject's wishes, is not extreme and outrageous as a matter of law. *See, e.g.*, *Cheney*, 654 F. App'x at 583-84 (news report falsely suggesting that plaintiff "was involved in a sex scandal" did "not rise to the level of 'extreme and outrageous'"); *Pinkney v. Meadville, Pa.*, 2020 U.S. Dist. LEXIS 73669, at *14 (W.D. Pa. Apr. 27, 2020) (news reports on "allegations of criminal activity have been found not to implicate the extremely high standard needed to maintain an intentional infliction of emotional distress claim"); *Hanenberg v. Borough of Bath*, 1994 U.S. Dist. LEXIS 10161, at *13 (E.D. Pa. July 27, 1994) (publication of allegedly defamatory news report about warrant for plaintiff's arrest was not sufficiently extreme and outrageous); *Weinstein v. Bullick*, 827 F. Supp. 1193,

1205 (E.D. Pa. 1993) (knowledge that college rape victim did not want to be identified by

television station "is insufficient to make the broadcast extreme and outrageous when it would

not otherwise be so"); *Morgan ex rel. Chambon v. Celender*, 780 F. Supp. 307, 309 (W.D. Pa.

1992) (publication of news report with names and photograph of minor sexual abuse victim and

her mother, despite assurances that they would not be published, was not sufficiently extreme

and outrageous); *Salerno*, 546 A.2d at 1172-73 ("[T]he publication of a newspaper article which

merely reports a shooting incident and possible motives thereof, cannot support a cause of action

for intentional infliction of emotional distress.").

     Applying this well-established standard, even if the documentary broadcast any

materially false fact about Williams (which it did not), her intentional infliction of emotional

distress claim should be dismissed with prejudice.

## III.   WILLIAMS CANNOT STATE A CLAIM FOR CIVIL CONSPIRACY.

     Williams' claim for civil conspiracy fails as a matter of law as well.  ***First***, because

Williams cannot state a claim for the underlying causes of action she asserts – defamation, false

light, and emotional distress – she cannot state a claim for conspiracy to commit those torts

either.  *See Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004) ("[A]bsent a

civil cause of action for a particular act, there can be no cause of action for civil conspiracy to

commit that act."); *McKnight v. Baker*, 415 F. Supp. 2d 559, 564 (E.D. Pa. 2006) (Robreno, J.)

("Conspiracy is not actionable without commission of some wrong giving rise to cause of action

independent of conspiracy."), *aff'd*, 244 F. App'x 442 (3d Cir. 2007); *Teeple v. Carabba*, 2009

U.S. Dist. LEXIS 119937, at *88 (E.D. Pa. Dec. 22, 2009) (Robreno, J.) (dismissing civil

conspiracy claim because all underlying causes of actions were dismissed), *aff'd*, 398 F. App'x

814 (3d Cir. 2010).  If the Court dismisses Williams' other claims in this case, her civil

conspiracy claim should also be dismissed with prejudice on this ground.

**Second**, Williams has failed to plead – and cannot plead – an essential element of a conspiracy claim:  malice.  *Sarpolis v. Tereshko*, 625 F. App'x 594, 601 (3d Cir. 2016).  For the conspiracy tort, "malice requires that the conspirators act with the *sole purpose* of injuring the plaintiff."  *Id.* (emphasis added); *see also, e.g.*, *Arsenal, Inc. v. Ammons*, 2014 U.S. Dist. LEXIS 166783, at *13 (E.D. Pa. Dec. 2, 2014) (dismissing civil conspiracy claim where defendants acted "to enrich themselves and their existing businesses," not with sole purpose of harming plaintiff).

Williams does not allege, even in conclusory fashion, that defendants acted with the **sole** purpose of harming her.  Instead, she pleads only that harming her was "**a** purpose" of the alleged conspiracy, making plain that defendants acted for other purposes.  Compl. ¶¶ 141-43 (emphasis added).  Other than this conclusory statement, Williams has not pleaded any facts that would plausibly support her contention that harming her was one of defendants' purposes, let alone any facts suggesting it was their sole purpose, as required under Pennsylvania law.  Indeed, it is utterly implausible that Roc Nation, Mill, Jay-Z, Amazon, and IPC produced and distributed a five-part documentary series about Mill's experience with the criminal justice system for the sole purpose of inflicting harm on Williams, and did so by displaying an image of a newspaper article referencing her for one second.  *See Conquest v. WMC Mortg. Corp.*, 247 F. Supp. 3d 618, 637 (E.D. Pa. 2017) ("Malice is not found where there are facts establishing that the person acted for professional reasons and not solely to injure the plaintiff."); *Parkland Servs. v. Maple Leaf Foods, Inc.*, 2013 U.S. Dist. LEXIS 55240, at *16 (E.D. Pa. Apr. 18, 2013) (granting motion to dismiss because "[t]he element of malice requires a showing that the sole purpose of the conspiracy is to cause harm to the party who has been injured"); *Morilus v. Countrywide Home Loans, Inc.*, 651 F. Supp. 2d 292, 313 (E.D. Pa. 2008) (malice not established where

"plaintiffs were guided by personal interests separate from any alleged desire to cause harm to"
alleged victim of conspiracy); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (concluding that
allegation of discriminatory intent was not plausible when obvious alternative motive for
defendant's actions existed).

      ***Finally***, Williams has failed to plead the existence of any conspiratorial agreement.  "The
existence of an 'agreement' is the sine qua non of a civil conspiracy."  *Teeple*, 2009 U.S. Dist.
LEXIS 119937, at *52.  Not just any agreement will suffice; it must be an agreement to "do an
unlawful act or to do a lawful act by unlawful means or for an unlawful purpose."  *Strickland v.
Univ. of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. 1997).  Williams' conclusory allegations
that defendants "engaged in a civil conspiracy" and had "a common purpose" to harm her,
Compl. ¶¶ 141-44, are insufficient to establish this element.  *See Adams v. Teamsters Local 115*,
214 F. App'x 167, 175 (3d Cir. 2007) ("[c]onclusory allegations of 'concerted action,' without
allegations of fact that reflect joint action, are insufficient to meet" pleading requirements).  She
has not alleged a single actual fact that would establish the necessary agreement to engage in
unlawful conduct.  Her factual allegations that defendants "jointly participated in the creation,
production and publishing of a documentary series" and "exercised control and supervision of
*Free Meek*," Compl. ¶¶ 12, 79, do not establish the type of agreement to engage in unlawful
conduct that is necessary for conspiracy.  *See, e.g.*, *Swartzbauer v. Lead Indus. Ass'n*, 794 F.
Supp. 142, 145 (E.D. Pa. 1992) (dismissing civil conspiracy claim notwithstanding allegation
that defendants undertook "collective activities" for their "economic and pecuniary benefit" and
to further their "respective and joint business interests")

Because Williams has not, and cannot, plead that defendants acted with the sole purpose of injuring her and had an agreement to engage in unlawful conduct to accomplish that purpose, her civil conspiracy claim should be dismissed for these reasons as well.

## CONCLUSION

For the foregoing reasons, Williams' Complaint against Amazon and IPC should be dismissed with prejudice.

Dated: September 10, 2020

Respectfully submitted,

BALLARD SPAHR LLP

By:   */s/ Michael Berry*
Michael Berry
berrym@ballardspahr.com
Elizabeth Seidlin-Bernstein
seidline@ballardspahr.com
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

*/s/ Derek Jokelson*
Derek Jokelson
dej@jokelson.com
JOKELSON LAW GROUP, P.C.
230 South Broad St., 10th Floor
Philadelphia, PA 19102
Telephone: 215.735.7556
Facsimile: 215.985.0476

*Attorneys for Defendant Amazon.com, Inc.*

Cameron Stracher (*pro hac vice* forthcoming)
cam@stracherlaw.com
CAMERON STRACHER, PLLC
51 Astor Place, 9th Floor
New York, NY 10003
Telephone: 646.992.3850
Facsimile: 646.992.4241

*Attorneys for Defendant Intellectual Property Corporation*